

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-11-00101-CV

IN THE INTEREST OF C.J. AND
L.J., CHILDREN

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

## I. Introduction

Appellant C.E.J. (Father) appeals the termination of his parental rights to two of his children. After a bench trial, the trial court found by clear and convincing evidence that Father had (1) engaged in conduct or knowingly placed the children with persons who had engaged in conduct that endangered the

---

[1]See Tex. R. App. P. 47.4.

physical or emotional well-being of the children, (2) knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being, and (3) knowingly engaged in criminal conduct that resulted in his conviction of an offense and confinement or imprisonment and inability to care for the children for not less than two years from the date of filing the petition.[2] The trial court also found that termination of Father's parental rights is in the children's best interest. Father challenges the legal and factual sufficiency of the evidence in four issues. We affirm.

## II. Background

Father and B.K. are C.J. and L.J.'s biological parents.[3] At the time of trial in December 2010, C.J. was four years old, and L.J. was three years old.

Investigator Brandy Butler testified that the Department of Family and Protective Services (the Department) received a referral in March 2009 alleging that Father's oldest son, who was fourteen at the time, was being left at home alone.[4] Butler spoke with B.K. and Father during her investigation of that incident. B.K. told Butler that Father was her former husband and the father of her two youngest children. B.K. also told Butler that Father was in jail at the time

---

[2]*See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (Q) (West Supp. 2012).

[3]The trial court also terminated B.K.'s parental rights, but B.K. is not a party to this appeal.

[4]The March 2009 referral was ruled "unable to determine" after the Department learned that the child, who is not involved in this appeal, had been left in his grandmother's care while Father traveled for work.

2

after being arrested in Denton County for driving while intoxicated (DWI). Father told Butler that he was arrested on April 5, 2009, and that he had consumed four beers and a Bloody Mary the day of his arrest.

The trial court admitted an exhibit reflecting that Father had entered an open plea of guilty to the April 2009 DWI charge and that Father had been sentenced to twenty-five years' confinement. The trial court also admitted several exhibits relating to Father's prior criminal record. Included are two prior convictions for misdemeanor DWI and three prior convictions for possession of marijuana. Butler testified that Father had also told her that he was paroled in 1994 for a burglary of a habitation conviction.

Father admitted to Butler that he had used marijuana in the past. Butler asked that Father take a drug test, but Father refused. Butler referred Father for a drug and alcohol assessment, but Butler never received confirmation that Father had submitted to the assessment. Butler testified that Father denied having a drinking problem.

Jeremy Dickinson is also a Department investigator. He was assigned an investigation relating to C.J. and L.J. on August 20, 2009. Dickinson testified that the Department was contacted because of a drug bust at a house in North Richland Hills, Texas, where C.J. and L.J. were living with B.K. According to Dickinson, both B.K. and her father, T.G., were involved in a drug ring, and the

house was being used "as the safe house for this crime ring."[5] The resulting federal information against B.K. alleged that she had, among other things, "intentionally and knowingly open[ed], maintain[ed], and us[ed] a place . . . for the purpose of distributing . . . methamphetamine." B.K. later pleaded guilty in federal court to "maintaining drug involved premises" and "structuring transactions to evade reporting requirements," and she was sentenced to consecutive sentences totaling more than eighteen years.

Dickinson testified that he went to B.K.'s house in North Richland Hills on the day of the drug bust. When he arrived, B.K. was handcuffed and in custody. There were ten to twenty law enforcement personnel, including federal and city officers, present at the home, and some of the officers were wearing full-body armor and helmets and carrying automatic weapons.

Dickinson testified that B.K. appeared to be under the influence of a narcotic when he saw her at the house. "She was very agitated, her pupils were dilated; she also had multiple scratches and sores on her head, neck, and face that are very common with heavy methamphetamine users." B.K. admitted to Dickinson that she had smoked marijuana and had used pain pills a few days earlier. B.K. told Dickinson that C.J. and L.J. were present in the home while the police conducted the raid, which he described as a scary scenario for the children. He testified that it is not safe for children to live in a drug house

_____

[5]Dickinson testified that T.G. was the leader of a large methamphetamine trafficking ring.

4

because they could be exposed to violence and because they might have access to drugs and ingest them, causing serious health injuries or death.

Dickinson also saw the children at the home. He testified that they appeared to have been fed and well cared for. He did not observe any signs that the children had been abused or neglected.

Dickinson interviewed Father on August 24, 2009,[6] and Father said that he knew the children lived with B.K. and that he had seen signs of drug use in B.K.'s appearance, specifically scratches and sores, as early as February 2008. Father also told Dickinson that B.K. had allowed him less and less contact with the children after February 2008.

Father told Dickinson that he had discussed his lack of contact with the children with T.G., but he also said that T.G.'s "associates . . . in no uncertain terms basically told him that he needs to back away because his life and his 14-year-old son's life were in danger if he continue[d] to pursue this." Father acknowledged to Dickinson that he did not seek custody of the children or contact law enforcement or the Department after learning of the circumstances in which they were living with B.K. and T.G., and he cited the threat by T.G.'s associates as the reason for not doing so. On cross-examination, Dickinson

---

[6]B.K. initially told Dickinson that Father was homeless, that he lived out of his car, and that she did not have Father's contact information, so Dickinson did not speak with Father until the day of the show cause hearing.

testified that he believed that Father was genuinely afraid to pursue further contact with his children.

Dickinson testified that Father acknowledged his pending April 2009 DWI charge and that Father admitted past marijuana and methamphetamine use. After the children had been removed and were in Department custody, Dickinson asked that Father take a hair follicle drug test, but Father refused. Dickinson acknowledged that Father's refusal could have been on the advice of counsel.

Carressa Cherry served as a Department caseworker for this case. She testified that Father's decision to not take action to remove his children from the dangerous situation with B.K. demonstrated poor parenting skills. She also testified that Father and B.K. cannot provide the children with stable housing because they will be in prison for twenty-five and eighteen years, respectively. Cherry said that Father and B.K. have not demonstrated that they can meet the children's emotional and physical needs because they are not able to contact or parent the children while they are incarcerated and because they are unable to provide for the children financially. Cherry also pointed to B.K.'s exposing the children to danger by putting them into an environment that involved drug use and people with histories of violent crimes. She testified that Father has a history of poor decision-making that included three DWI convictions and other criminal charges in addition to not intervening for his children when they lived with B.K.

Cherry testified that it is in the children's best interest if Father's and B.K.'s parental rights are terminated and that the Department intends to make the

6

children available for adoption. She also testified that because of his other criminal history and refusal to take drug tests, her best interest opinion would not change if Father were released from incarceration. Cherry said that Father's DWI convictions, even though the children were not with him, revealed a concerning pattern of behavior. Also, although B.K. was directly responsible for the children living in a dangerous home environment, Father had a responsibility to take steps to protect them. Cherry testified that Father could have contacted the Department, an attorney, or law enforcement to report that he believed there was drug activity in the home.

Cherry also testified that Father had not completed counseling or parenting classes.[7] However, she acknowledged that her opinions would not change even if he had completed those services because of his lengthy prison sentence. Father had already been arrested for the 2009 DWI offense when this case started, and it was resolved in the summer of 2010. Cherry also testified that she could not speculate on what might occur if Father's most recent DWI conviction were reversed on appeal.

Cherry testified that the children are in foster care. The foster parents have a biological daughter, and Cherry had witnessed the children's interaction with the foster family and described their relationship with the children as

---

[7]Cherry agreed that six months is an unreasonable time for the Department to wait before sending referrals for Father's services if that is what occurred in this case.

7

positive. Cherry was asked to describe how C.J. and L.J. were doing at the time of trial, and she testified,

> They're doing very well. Their behavior overall is good. They participate in a pre-school program several days a week to assist with learning and socialization.
>
> [L.J.] was having problems with her speech, but that's actually greatly improved over the last several months.
>
> Both of the children are very sweet and loving kids, always wanting to give hugs and interactive play. They're up-to-date on all their medical and dental exams, and there are no health concerns at this time, and they are seeing a play therapist once a week.

Cherry said that the children do not have any identified, special needs at present. She testified that they are involved with play therapy to help them with the transition into foster care and that the children, who were initially placed with relatives, had a hard time when they first arrived in foster care.

Cherry testified that neither Father nor B.K. had provided the Department with the names of any appropriate caregivers with whom the children could be placed. However, Cherry also testified that the Department was in the process of completing a home study of B.K.'s cousin, D.O., who resides in Maryland. That process was not complete at the time of trial because of information required by the State of Maryland to complete the home study, but Cherry testified that D.O. seemed to be an appropriate placement for the children based on information currently known to her. Cherry also testified that B.K. had written her a letter stating her desire for the children to be adopted by D.O.

8

Cherry testified that the children's current foster family would also like to adopt the children if they are not adopted by D.O. and that the current foster family would be a good, long-term placement for the children. Cherry testified that, regardless of who might adopt the children, the adoptive family would be eligible to receive through the Department a monthly adoption assistance payment, Medicaid health coverage, adoption-expense reimbursements, counseling, state-college tuition in Texas for the children, and other post-adoption services.

Allen Palmer served as the children's court-appointed special advocate (CASA). He recommended termination of Father's parental rights because of the lengthy prison sentence for Father's most recent DWI conviction. But Palmer also testified that he would not recommend termination if Father had instead received probation or a short prison sentence with a possibility of parole within a year or two.

Palmer said that Ruth Groomer, the initial caseworker, was "less than helpful," that she did not treat Father in a fair way so that he could complete his services, and that the Department file reflected that Father had taken no action toward his service plan and was not responding to Groomer's attempts to contact him. Palmer testified that, to the contrary, Father went "above and beyond" in trying to complete his service plan before he was incarcerated. He was working, was trying to take care of the children, and had rented an apartment and

9

arranged for a larger place if he was given custody of the children. Father's efforts, however, necessarily stopped when he was incarcerated.

Palmer visited C.J. and L.J. at their current foster home, and he testified that they seem well-adjusted and happy there. The children have responded well to the structure in the current foster home, and the behavioral issues they exhibited in the past "are being dealt with expediently and very nicely" in the current home. Palmer said that the children are "very smiling and happy," and he testified that he does not have any concern that the current foster home would be an appropriate, long-term placement for the children.

Groomer testified that she served as the Department caseworker beginning August 26, 2009, and ending in August 2010. She first met with Father at the show cause hearing in September 2009. She interviewed B.K. at the Parker County Jail in October 2009. Mother told her that Father had abandoned her, the children, and Father's oldest son without money for food or electricity. Groomer agreed that she could not verify Mother's statement but testified that Mother's body language suggested that she was telling the truth. Mother was very upset and said that Father's leaving was the reason she started selling drugs.

Groomer testified that the children were not placed with Father following their removal from B.K. because of the pending felony DWI case against him, not because B.K. had said he abandoned her and the children. She testified that her supervisor, following Department policy, made the decision to decline placement

with Father, but she also said that Father, depending on the outcome of his criminal charges, was not permanently disqualified from future placement.

Groomer testified that Father did not complete his service plan. To her recollection, Father submitted to a drug and alcohol evaluation and a psychological assessment. She said that Father did not attend counseling or parenting classes and that he never provided proof that he had a job or stable housing. Groomer testified that Father would not tell her when she could visit his home, even though she volunteered to go there on a weekend.

Groomer testified that Father falsified information during his psychological assessment and that he was found in his drug and alcohol evaluation to have addictions and was referred to Alcoholics Anonymous (AA). Groomer testified that Father never provided her with sign-in sheets from his AA meetings, and she said he did not show up for his counseling appointment with Catholic Charities.

Groomer said Father asked her "[m]aybe two or three times" for the referral forms for his service plan, but she testified that she had already sent them by e-mail or fax and denied that the service providers did not receive the referral forms. She testified that she would follow up with service providers to confirm whether the parent had set up an appointment or had been participating in services and that those confirmations are reflected in her case notes. Groomer acknowledged, however, that caseworkers have too many cases and try to do what is best for the children and that the "paperwork comes last." Groomer denied having previously seen several exhibits concerning Father's work toward

11

his service plan, including a progress report and certificate of completion from MHMR of Tarrant County, Father's AA attendance record, Father's 1099 forms, and a certificate of completion for a parenting class Father took on his own accord.[8]  Groomer testified that she could not know whether Father was completing his service plan if he did not provide her with documentation to confirm his efforts.

Groomer testified that Father's parental rights should be terminated because he has a criminal history that began twenty-three years earlier. Specifically, termination was necessary because his most recent conviction was felony DWI.  Had the felony offense been dropped, and had he completed his service plan, the Department's plan would have remained family reunification.

Father testified that he has a fifth grade education and does not have a GED.  When the children were removed, Father had a construction and roofing job, the type of job he had always worked.  He testified that, in the past, he had been a "storm-chaser," meaning that he traveled to areas where there had been tornadoes or hail storms and helped people rebuild their homes.  Father denied leaving B.K. and the children without money for food or utilities.

Concerning his April 2009 DWI arrest, Father admitted drinking six beers at a NASCAR race, having a blood-alcohol level of .08, and being legally

_____

[8]Groomer acknowledged, however, that if Father took and completed an independent class that covered the same topics required by the service plan, the Department would allow the independent class to count toward completion of the service plan.

12

intoxicated. He testified, however, that he has not "touched a drop since," that he is current on all of his AA and NA meetings, and that he has taken parenting classes. Father asked that the court not terminate his parental rights and place the children with family so that he would not lose his chance to see the children grow up and be a part of their lives.

Father testified that he worked his service plan to the best of his ability. He attended every visitation, was never late, paid child support, and gave the children clothes and toys. Father testified that Groomer prevented him from taking pictures of the children[9] and that it took her six months to give him the forms necessary to work his service plan. He said that he passed a drug test shortly after this case started and that he last used drugs, specifically marijuana, in December 2007. Father admitted refusing a drug test during this case, but he testified that he did so on the advice of his criminal lawyer. Father also admitted using methamphetamine in the past but said that it was more than twenty years earlier.

Father testified that he did not know where the children were living before they were removed by the Department; he only knew that they were living with T.G. and B.K. He testified that, as time passed, B.K. allowed him less and less contact with the children because she was abusing drugs and did not want him to know. Father said that his first thought when he learned in April 2008 of B.K.'s

---

[9]Groomer denied this and testified that she was not present at that visit.

drug problem was to get her help but that she did not want his help.  Father testified that he talked to B.K. and asked her if he could speak with T.G.  When Father arrived at T.G.'s house, T.G. was not there, but one of T.G.'s associates took Father to the garage where plastic sheets covered the entire floor.  Father testified that "it was something out of a movie, you would think" and that it scared him.  Father also described what T.G.'s associate said to him:

> He told me that, [Father], I like you, but if [T.G.] says I've got to kill you, I've got to kill you.  You and your son will disappear.  I'm going to tell you how I'm going to do it.  We'll come over in the middle of the night and kick your front door open and you will disappear and nobody will ever see you again.

Father testified that he was told that T.G. "had cops and judges on the payroll," that he knew that T.G. had a "previous conviction [for] a chopped-up body in his trunk where he done 10 years in prison," and that he did not feel he had a choice about taking action to get the children away from T.G. and B.K.  On cross-examination, however, Father agreed that when their children are involved, parents must rise above threats to their personal safety to protect their children, and he expressed regret for not having done so.

Father testified that he was incarcerated on June 15, 2010.  The April 2009 DWI was his third DWI, and although his attorney led him to believe that he was eligible for probation, he later learned that he faced a minimum sentence of twenty-five years because of his two prior DWI convictions and his other criminal convictions.  Father also testified that, three or four days before his criminal disposition hearing, he saw a white, powdery substance (which he believed to be

14

cocaine from his past drug experience) on a small mirror on his attorney's desk. He could not fire his attorney, though, because he had paid him $10,000 and had only a few days before his final hearing. Father testified that he believed he had paid his attorney to have a jury trial but that his attorney instead arranged for an open plea of guilty. Father said that he did not tell the judge about his lawyer using drugs because he was scared that the judge would not believe him and was afraid that he would not have any legal representation. Father testified that the judge sentenced him to the minimum possible sentence, but the sentence was still twenty-five years. Father also testified that he had recently learned that the court of criminal appeals had granted him the right to file an out-of-time appeal. Father said that if he were granted a new trial and could somehow get probation, he wants to continue working to get the children back.[10]

Father testified that the children's potential placement in Maryland would be good because D.O. is part of the family and that he would want the children with family if his current fiancée was not an available placement option. Father also said that his mother, who has custody of his now-sixteen-year-old son, would be an appropriate placement.

---

[10]Father's criminal appeal was decided after the trial court signed the order terminating Father's parental rights, but we note that this court affirmed Father's DWI conviction in November 2011. We do not include the citation to that opinion in order to protect Father's and the children's identities. *See generally* Tex. R. App. P. 9.8.

### III. Standards of Review

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). "While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (West 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20–21; *In re R.R.*, 294 S.W.3d 213, 233 (Tex. App.—Fort Worth 2009, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may

16

not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re D.T.*, 34 S.W.3d 625, 629 (Tex. App.—Fort Worth 2000, pet. denied) (op. on reh'g).

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001; *see also id.* § 161.206(a). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (West 2008). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a

17

reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id.*

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated subsection (D), (E), or (Q) of section 161.001(1) and that the termination of the parent-child relationship would be in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *C.H.*, 89 S.W.3d at 28. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

## IV. Statutory Endangerment

Father argues in his first three issues that the evidence is legally and factually insufficient to support the trial court's section 161.001(1)(D), (E), and (Q) findings.

## A. Former Family Code Section 263.405(i)

The Department argues that we need not consider Father's first three issues because he failed to include his third issue—the challenge to the trial court's section 161.001(1)(Q) finding—in his statement of points for appeal and because the unchallenged finding negates our need to review the section 161.001(1)(D) and (E) findings because it independently supports the trial court's judgment.[11] We overrule the Department's argument for the reasons stated in this court's prior opinions in *In re A.J.M.*, No. 02-11-00137-CV, 2012 WL 2877457, at *1 (Tex. App.—Fort Worth July 16, 2012, no pet. h.) (op. on reh'g) (en banc), and *In re D.W.*, 249 S.W.3d 625, 645 (Tex. App.—Fort Worth) (en banc), *pet. denied*, 260 S.W.3d 462 (Tex. 2008) (per curiam).

## B. Discussion

Family code section 161.001(1)(Q) states:

> The court may order termination of the parent-child relationship if the court finds by clear and convincing evidence:
>
> (1) that the parent has:
>
>> (Q) knowingly engaged in criminal conduct that has resulted in the parent's:
>>
>>> (i) conviction of an offense; and
>>>
>>> (ii) confinement or imprisonment and inability to care for the child for not less than two years from the date of filing the petition.

---

[11]The Department does not argue that Father waived his challenge to the trial court's best interest finding.

Tex. Fam. Code Ann. § 161.001(1)(Q).

Father argues that the evidence is legally and factually insufficient to support termination under section 161.001(1)(Q) because the conviction for which he is currently serving a twenty-five year sentence is "riddled with problems," and he points to the evidence concerning his attorney's alleged inadequate representation and drug use, his own alleged failure to knowingly plead guilty, and his pending appeal. However, the trial court could have, in its role as the sole judge of the credibility of the witnesses and the weight to be given to their testimony, disbelieved Father's testimony about his attorney's representation and drug use. *See In re C.S.L.E.H.*, No. 02-10-00475-CV, 2011 WL 3795226, at *5 (Tex. App.—Fort Worth Aug. 25, 2011, no pet.) (mem. op.); *see also In re T.N.*, 180 S.W.3d 376, 382–83 (Tex. App.—Amarillo 2005, no pet.) ("[T]he fact finder, as opposed to the reviewing body, enjoys the right to resolve credibility issues and conflicts within the evidence. It may freely choose to believe all, part, or none of the testimony espoused by any particular witness."). Moreover, by contending that he did not knowingly plead guilty, Father misapplies the wording of section 161.001(1)(Q). The statute requires that Father knowingly engage in criminal activity that results in conviction, confinement, and an inability to care for his children for at least two years following the date of the Department's original petition, not that Father knowingly agreed to plead guilty or receive a certain sentence of imprisonment. *See* Tex.

Fam. Code Ann. § 161.001(1)(Q); *see also In re A.V.*, 113 S.W.3d 355, 360 (Tex. 2003) (holding two years in section 161.001(1)(Q) is measured prospectively).

Father also argues that there is no evidence that he knowingly committed the April 2009 DWI because he did not testify about his intent or mental state. But there is evidence from which the trial court could have found by clear and convincing evidence that Father knowingly engaged in criminal conduct. For example, Father had two prior DWI convictions and was required to have a device in his car to prevent him from driving while intoxicated. Further, Father testified that he drank six beers at a NASCAR race on the day of his April 2009 arrest. The trial court could have determined that Father knowingly engaged in criminal conduct by driving his vehicle after drinking six beers at the race. *See generally* Tex. Penal Code Ann. § 6.03(b) (West 2011) (providing that a "person acts knowingly . . . with respect to the nature of his conduct . . . when he is aware of the nature of his conduct . . . . A person acts knowingly . . . with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.").

The evidence also satisfies the remainder of the statutory requirements. Father was convicted of the April 2009 DWI and sentenced to twenty-five years' confinement. Cherry testified that Father had no contact with the children from prison and that he could not provide for the children from prison. Thus, there is evidence that Father was convicted of a criminal offense, that he would be imprisoned or confined for at least two years, and that he would be unable to

care for the children for at least two years. *See* Tex. Fam. Code Ann. § 161.001(1)(Q); *In re B.M.R.*, 84 S.W.3d 814, 817–19 (Tex. App.—Houston [1st Dist.] 2002, no pet.) (holding legally and factually sufficient evidence supported termination under section 161.001(1)(Q)).

Applying the appropriate standards of review, we hold that the evidence is legally and factually sufficient to support termination of Father's parental rights under section 161.001(1)(Q). *See J.P.B.*, 180 S.W.3d at 573; *see also H.R.M.*, 209 S.W.3d at 108. We overrule Father's third issue.[12]

## V. Best Interest

Father argues in his fourth issue that the evidence is factually insufficient to support the trial court's best interest finding.

## A. Applicable Law

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2008). Nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

---

[12]Along with a best interest finding, a finding of only one ground alleged under section 161.001(1) is sufficient to support a judgment of termination. *In re E.M.N.*, 221 S.W.3d 815, 821 (Tex. App.—Fort Worth 2007, no pet.). We thus need not address Father's first and second issues. *See id.*; *see also* Tex. R. App. P. 47.1, 47.4.

22

(A)     the desires of the child;

(B)     the emotional and physical needs of the child now and in the future;

(C)     the emotional and physical danger to the child now and in the future;

(D)     the parental abilities of the individuals seeking custody;

(E)     the programs available to assist these individuals to promote the best interest of the child;

(F)     the plans for the child by these individuals or by the agency seeking custody;

(G)     the stability of the home or proposed placement;

(H)     the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)     any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted). These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate.  *C.H.*, 89 S.W.3d at 27.  Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child.  *Id.*  On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

**B.  Discussion**

Father acknowledges his current incarceration but argues that the evidence is factually insufficient to support the trial court's best interest finding

23

because the evidence demonstrates that he is "a loving father who has the capacity to raise children in a safe environment." Father also acknowledges his past criminal convictions, but he argues that he did not personally endanger the children, that the children lived with B.K. when they were removed, and that he does not pose a future danger to the children. He also points to evidence that he interacted appropriately with the children, attended all of the visitations, took clothes and toys to the children, worked diligently on his service plan, and demonstrated an ability to maintain stable employment and housing prior to his incarceration. Father also points out that he had custody of his teenage son and that there was no evidence that his parenting skills were detrimental to the children. Finally, Father argues that his actions are excusable because his life was threatened by T.G.'s associates and because he allegedly received ineffective assistance of counsel for his most recent DWI conviction.

Father's arguments highlight the evidence favorable to his position, but the trial court also heard other evidence concerning the children's best interest. The children were removed from B.K.'s custody following a drug bust at the home in which the children were living. The children were present during the drug bust. Father knew that the children were living in dangerous conditions but never contacted the Department or any law enforcement agency in an effort to protect the children from danger. Mother was sentenced to eighteen years' confinement for her role in the drug trafficking operation, and Father was sentenced to twenty-five years' confinement for his third DWI conviction. Father also has three prior

24

convictions for possession of marijuana and a conviction for burglary of a habitation. Neither of the parents can provide support to the children while they are incarcerated.

The children had some difficulties when they were first placed into foster care, but they have both participated in play therapy and are doing quite well now. The Department is in the process of approving placement for the children with D.O., a family member who resides in Maryland, and Cherry testified that she was not aware of any reasons that D.O. would not be approved for placement. D.O. wants to adopt the children, and Mother and Father each expressed that they approve of a placement with D.O. If the children are not adopted by D.O., their current foster family would like to adopt them. Witnesses testified that either D.O. or the current foster family would be appropriate environments for the children. Regardless of who adopts the children, the adoptive family will have numerous resources available to them for assistance, and the children will be eligible to receive tuition to attend a Texas public university.

The trial court stated at the conclusion of the trial that it was "fairly obvious" that Father loved the children but that it was required to make a determination of what is in the children's best interest. Applying the appropriate standard of review, we hold that factually sufficient evidence supports the trial court's finding that termination of Father's parental rights is in the children's best interest. *See H.R.M.*, 209 S.W.3d at 108. We overrule Father's fourth issue.

25

## VI.  Conclusion

Having overruled each of Father's dispositive issues, we affirm the trial court's judgment.

ANNE GARDNER
JUSTICE

PANEL:  DAUPHINOT, GARDNER, and WALKER, JJ.

DAUPHINOT, J. concurs without opinion.

WALKER, J. filed a concurring opinion.

DELIVERED:  August 2, 2012



# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-11-00101-CV

IN THE INTEREST OF C.J. AND
L.J., CHILDREN

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

----------

## CONCURRING MEMORANDUM OPINION[1]

----------

Although I did not agree with the reasoning of the en banc opinion of the majority in *In re A.J.M.*, No. 02-11-00137-CV, 2012 WL 2877457, at \*1 (Tex. App.—Fort Worth July 16, 2012, no pet. h.) (op. on reh'g) (en banc), that opinion is nonetheless binding precedent in this appeal. Therefore, I respectfully concur with the majority opinion in this appeal. *See generally Ross v. Union Carbide Corp.*, 296 S.W.3d 206, 221 (Tex. App.—Houston [14th Dist.] 2009, pet. denied) (en banc) (Frost, J., concurring) (stating that "'absent (1) a decision from a higher

---

[1]*See* Tex. R. App. P. 47.4.

court or this court sitting en banc that is on point and contrary to the prior panel decision or (2) an intervening and material change in the statutory law, this court is bound by the prior holding of another panel of this court'").


SUE WALKER
JUSTICE


DELIVERED: August 2, 2012

2